UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TALA RUSSELL,<br><br>    Plaintiff,<br><br>v.<br><br>KRONOS INCORPORATED,<br><br>    Defendant. | Case No. 18-cv-04525-EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 55 |

Plaintiff Tala Russell has filed an employment discrimination case against her former employer Kronos Inc. The specific claims she has asserted are as follows:

- Sex discrimination in violation of FEHA and Title VII (claims 1 and 7).
- National origin discrimination in violation of FEHA and Title VII (claims 2 and 8).
- Race discrimination in violation of FEHA and Title VII (claims 3 and 9).[1]
- Retaliation in violation of FEHA and Title VII (claims 4 and 10).
- Failure to prevent discrimination and harassment in violation of FEHA (claim 5).
- Wrongful discharge in violation of public policy (claim 6).

Currently pending before the Court is Kronos's motion for summary judgment. Kronos asks for summary judgment on all causes of action.

## I.     FACTUAL & PROCEDURAL BACKGROUND

The evidence submitted by the parties reflects as follows. (Where there are disputes of fact, or evidentiary objections in need of ruling, they are so noted.)

---

[1] Ms. Russell has asserted only discrete claims for sex discrimination, national origin discrimination, and race discrimination. She has made no attempt to argue that she has a claim for discrimination based on a combination of factors – *e.g.*, being a Hispanic woman in particular.

Ms. Russell is a Hispanic woman. *See* Burton Decl., Ex. 211 (Russell Depo. at 18). She worked for Kronos from approximately September 2013 to July 2017 (almost four fiscal years[2]) as a Senior Sales Executive. Kronos terminated Ms. Russell purportedly because of poor performance. The decision to terminate was made by her direct supervisor, Chris Lipscomb, with the approval of Human Resources and Mr. Lipscomb's superiors (Tony Lombardi and Robert Kennedy). *See* Cullen Decl. ¶ 9.

For Ms. Russell's first year of employment with Kronos (FY2014), there is no evidence in the record about her performance.[3]

For Ms. Russell's second year of employment (FY2015), it appears that she achieved 66% of her annual quota. *See* Cullen Decl., Ex. 178 (draft LOC). Her direct supervisor at the time, Mike Solomon gave her a performance review that included some positives but also included some criticisms. His overall rating for her performance was "Inconsistent." Hudson Decl., Ex. 63 (Performance Review at 10).

For Ms. Russell's third year of employment (FY2016), Ms. Russell achieved 95% of her quota. *See* Russell Decl. Ex. 194 (FY2016 Worldwide Sales Rankings). Kronos maintains, however, that quota attainment is not the only metric on which a sales executive's performance is measured. *See* Cullen Decl. ¶ 8; Lipscomb Decl. ¶ 28. Kronos also asserts that the 95% quota attainment for FY2016 is misleading because it includes split commissions. According to Kronos, if two deals (with DirecTV and U.K. Celesio) are excluded because they involved split commissions, then Ms. Russell's quota attainment for FY2016 is actually 32%. *See* Lipscomb Decl., Ex. 164 (Mr. Lipscomb's notes); Cullen Decl. ¶ 7 & Ex. 170 (email). Kronos adds that, even if only the U.K. Celesio deal is excluded (*i.e.*, Ms. Russell disputes that the DirecTV deal involved a split commission), her quota attainment is only about 63%. *See* Cullen Decl., Ex. 178

---

[2] Kronos operates on a fiscal year that begins on October 1 and ends on September 30. *See* Lipscomb Decl. ¶¶ 3, 5.

[3] In her opposition, Ms. Russell claims that she achieved 121% of her annual quota for FY2014, *see* Opp'n at 2, but she does not cite to any evidence in support. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (stating that "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found").

(draft LOC). In response, Ms. Russell argues that "there is no written requirement that a sales executive must complete the deals alone to be successful." Opp'n at 2.

In or about October 2016, *i.e.*, following the close of FY2016, Ms. Russell's direct supervisor at the time, Mr. Solomon, drafted a Letter of Concern ("LOC") regarding Ms. Russell's performance. *See* Cullen Decl., Ex. 178 (LOC); Cullen Decl., Ex. 177 (email). In the draft LOC, Mr. Solomon questioned her sales productivity (based on her quota attainments for the prior two years) and also her "pipeline" development (*i.e.*, possible deals). The LOC was never issued because Mr. Solomon resigned thereafter and "it was felt the matter should wait for plaintiff's new supervisor to assume his or her post." Cullen Decl. ¶ 6.

In addition, in or about October 2016, Kronos reorganized the "vertical" (*i.e.*, line of business) in which Ms. Russell worked. More specifically, Kronos created a new subvertical, "targeting larger accounts with an international footprint," and "[s]everal sales executives, including Tommy Chacko, were promoted to a Global Account Manager at that time." Lombardi Decl. ¶ 5. The restructuring resulted in the transfer of three of Ms. Russell's accounts to Mr. Chacko. The three accounts were McKesson, Microsoft, and Teletech.[4] *See* Lombardi Decl. ¶ 5. According to Ms. Russell, the transfer of the three accounts was a major factor in her sales numbers going down. However, she testified at her deposition that she did not have any reason to believe that the transfer of the accounts had anything to do with her sex or ethnicity.[5] *See* Hudson Decl., Ex. 190 (Russell Depo. at 41-42).

For the McKesson account, Ms. Russell continued to do work even after the transfer of the account to Mr. Chacko – through approximately March 2017. *See* Russell Decl., Ex. 207 (emails). Ms. Russell's direct supervisor at the time (Mr. Lombardi) told Ms. Russell that she would be entitled to split commissions with Mr. Chacko for the first three quarters of FY2017. *See*

---

[4] At the hearing, Ms. Russell asserted that Mr. Chacko was a Global Account Manager for one year only and then reverted back to his prior position as a Sales Executive, keeping the McKesson account with him. Although there is evidence that Mr. Chacko was only a Global Account Manager for one year, *see* Chacko Reply Decl. ¶ 1, there is no evidence about what happened with the McKesson account after he was no longer a Global Account Manager.

[5] The record is not clear as to who the decisionmakers were at Kronos with respect to the restructuring.

3

Lombardi Decl. ¶¶ 6-7. Ms. Russell was ultimately fired at the end of 3Q FY2017 before any McKesson deals actually closed and thus she never received any split commissions. *See* Russell Decl., Ex. 207 (emails). According to Ms. Russell, Mr. Chacko deliberately delayed in closing the McKesson deals in order to deprive her of the split commissions. Mr. Chacko, however, denies such. *See, e.g.*, Chacko Reply Decl. ¶ 3 (testifying that "[t]he notion that I would deliberately delay . . . in order to avoid sharing a commission is absurd" because, "[a]s anyone involve[d] in sales understands, securing the customer's signature on a contract is the only effective assurance that a sale will occur"); Chacko Reply Decl. ¶ 5 (testifying about the "[m]any factors caus[ing] the closing of the McKesson contract to be delayed"). Mr. Chacko is not a named defendant and he is not alleged to be a decisionmaker here.

Mr. Lipscomb became Ms. Russell's direct supervisor in or about February 2017. *See* Lombardi Decl. ¶ 10. Approximately a month later, in March 2017, Mr. Lipscomb told Ms. Russell that she "would be more suited to take a customer service role." Hudson Decl., Ex. 46 (Ms. Russell's notes). In April 2017, Mr. Lipscomb began to work with Human Resources on a LOC regarding Ms. Russell's performance. *See* Lipscomb Decl. ¶ 13. According to Mr. Lipscomb, there were several considerations that led to his conclusion that a LOC was necessary. For example, Ms. Russell's quota attainment at the time was below 12% (2Q FY2017 had just closed). *See* Lipscomb Decl. ¶ 4. Also, Ms. Russell's opportunities in the pipeline were not qualified and were not progressing through sales stages. *See* Lipscomb Decl. ¶ 6; *see also* Lombardi Decl. ¶ 9 (testifying that a qualified opportunity is "an opportunity where a prospect has an actual need for a product or service offered by Kronos, and there is a reasonable probability that that prospect will actually purchase from Kronos"). Sales productivity and pipeline development were issues that had also been identified by both of Ms. Russell's prior direct supervisors, Mr. Solomon (who authored the draft LOC discussed above) and Mr. Lombardi. *See* Lombardi Decl. ¶ 9 (discussing pipeline development).

Mr. Lipscomb issued the LOC to Ms. Russell on April 13, 2017. Areas of concern identified on the LOC included sales productivity (based on quota attainment for the year) and pipeline development. *See* Lipscomb Decl., Ex. 112 (LOC).

4

On June 2, 2017, Mr. Lipscomb issued a performance improvement plan ("PIP") to Ms. Russell, purportedly because her performance continued to be poor. *See* Lipscomb Decl., Ex. 20 (PIP); Lipscomb Decl., 127 (email). In the PIP, Mr. Lipscomb set certain performance goals for Ms. Russell to obtain by July 14, 2017 (*i.e.*, just after 3Q FY2017). For example, "[a] minimum quota attainment of 75% YTD is expected." Lipscomb Decl., Ex. 20. Also, "[e]xpect a pipeline of 3x annual quota (with movement through stages) and forecast of minimum 80% of quota as well (monthly & quarterly)." Lipscomb Decl., Ex. 20. Ms. Russell suggests that these were unrealistic goals.

Shortly before the PIP review period was to close, Mr. Lipscomb communicated with Human Resources about Ms. Russell's performance. He noted, *inter alia*, that her quota attainment for FY2017 remained quite low. *See* Lipscomb Decl., Ex. 164 (Mr. Lipscomb's notes) (indicating 9% for Q1, 1% for Q2, and 7% for Q3). He also indicated that Ms. Russell's forecast for Q4 was questionable. *See* Lipscomb Decl., 164; *see also* Lipscomb Decl. ¶¶ 26, 29 (indicating that two opportunities identified by Ms. Russell never closed).

The decision to terminate Ms. Russell was made by Mr. Lipscomb with the approval of Human Resources and his two superiors, Mr. Lombardi (who had been Ms. Russell's direct supervisor for a brief period of time) and Mr. Kennedy. According to Mr. Lipscomb,

> [t]he decision to terminate Plaintiff in July of 2017 was not a one-dimensional decision based on just plaintiff's quota attainment in fiscal year 2017. We looked at the entire picture, and considered other factors, including the following: (1) plaintiff had worked for Kronos as a Senior Sales Executive since 2013, and therefore had almost four years to build her pipeline; (2) plaintiff was assigned to a mature vertical, the Services and Distribution vertical; (3) during FY 2017 plaintiff had not demonstrated progress in moving opportunities in her pipeline through the various sales stages; as of July of 2017, it did not appear that any significant sales were on the horizon; (4) I had personally observed plaintiff's performance during numerous sales meetings, and her performance was unimpressive; she often exhibited a serious lack of preparation and planning, as well as a lack of attention and participation in the meetings; (5) although plaintiff had nominally achieved 95% of her quota in FY 2016, this was the only year she came close to achieving her quota, and she did so only because of major transactions on which another sales representative was, at a minimum, a major contributor; and (6) plaintiff's forecasting of sales was generally neither sufficient nor accurate.

5

Lipscomb Decl. ¶ 31.  The decision to terminate was communicated to Ms. Russell on July 17, 2017.  *See* Lipscomb Decl. ¶ 30.

Ms. Russell was replaced by a woman.  *See* Cullen Decl. ¶ 12.

## II.     DISCUSSION

A.     Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor.  *See id.* at 255.

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only by pointing to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (stating that, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor") (emphasis omitted).

B.     Sex Discrimination

Ms. Russell brings claims for sex discrimination pursuant to Title VII as well as FEHA.

Under Title VII, where a plaintiff claims sex discrimination on the basis of disparate treatment, she may establish her case by using the *McDonnell Douglas* framework[6] or by simply

---

[6] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

producing direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant. *See Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 696 (9th Cir. 2017).

Similarly, where a plaintiff brings a sex discrimination claim under FEHA, she may rely on the *McDonnell Douglas* framework. *See Moore v. Regents of Univ. of Cal.*, 248 Cal. App. 4th 216, 234 (2016) (stating that, "[b]ecause a plaintiff does not often possess or obtain direct evidence that an illegitimate criterion was a substantial factor in a particular employment decision, California has adopted the three-stage burden shifting test for discrimination claims set forth in *McDonnell Douglas*").

In the instant case, Ms. Russell relies on the *McDonnell Douglas* framework for her sex discrimination claim – as well as for her other disparate treatment claims. Under that framework, a plaintiff may establish a prima facie case of employment discrimination by showing (1) that she is a member of a protected class; (2) that she was qualified for the position and was performing the job satisfactorily; (3) that she experienced an adverse employment action; and (4) that similarly situated individuals outside the protected class were treated more favorably (or that there are other circumstances surrounding the adverse employment action that give rise to an inference of discrimination). *See Hawn v. Exec. Jet Mgmt.*, 615 F.3d 1151, 1156 (9th Cir. 2010).

> If the plaintiff establishes a prima facie case, then [t]he burden of production, but not persuasion, . . . shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. If defendant meets this burden, [the] plaintiff[] must then raise a triable issue of material fact as to whether the defendant's proffered reasons for [the] termination [or other adverse employment action] are mere pretext for unlawful discrimination.

*Id.* at 1155.

> "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." "All of the evidence [as to pretext] – whether direct or indirect – is to be considered cumulatively."
>
> Where the evidence of pretext is circumstantial, rather than direct, the plaintiff must present "specific" and "substantial" facts showing that there is a genuine issue for trial. However, that requirement is

tempered by [the Ninth Circuit's] observation that, in the context of Title VII claims, the burden on plaintiffs to raise a triable issue of fact as to pretext is "hardly an onerous one."

*Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007).

1. Prima Facie Case

In the pending motion for summary judgment, Kronos assumes that Ms. Russell has enough evidence to make out a prima facie case of sex discrimination under *McDonnell Douglas*. *See* Mot. at 17. Kronos argues, nevertheless, that it is entitled to summary judgment because it had legitimate nondiscriminatory reasons for terminating Ms. Russell, and Ms. Russell has failed to raise a triable issue of material fact as to whether those reasons are mere pretext for unlawful discrimination.

Because Kronos assumes that Ms. Russell has satisfactorily established a prima facie case, the Court shall also make that assumption. That being said, it is doubtful whether the evidence of record in fact supports a prima facie case of sex discrimination. Although Ms. Russell asserts that similarly situated men were treated more favorably, she does not identify any specific men in her papers, *see* Opp'n at 5 (arguing only that "[s]everal other employees outside of Plaintiff's protected class failed to meet their quotas for fiscal year 2016 and 2017 and they were not terminated"), and her chart at Exhibit 203 (attached to her declaration) does not provide enough information to indicate that any of the men listed on the chart were similarly situated "'in all material respects.'"[7] *Beck v. UFCW*, Local 99, 506 F.3d 874, 885 (9th Cir. 2007). For example, the chart does not indicate how long any of the men had worked at Kronos. Also, while the chart provides information about the men's quota attainments for FY2016 and part of FY2017, it does not provide information about their forecasts for Q4 FY2017; nor does the chart provide

---

[7] Kronos has objected to Exhibit 203 on the basis that it is not admissible evidence. *See* Reply at 13 (arguing that "[i]t is unclear why Plaintiff is relying on her purported summary of Kronos records" as she "has made no showing that the originals are unavailable"; "[t]o the extent Plaintiff might argue that Exhibit 203 is admissible as a summary of voluminous writings under Rule 1006, Plaintiff has not offered to make the source materials available, and is presumably unable to do so"). But evidence may be presented in a form that is not admissible at trial so long as it could ultimately be capable of being put in admissible form. *See* Fed. R. Civ. P. 56(c)(2) (providing that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence").

8

information about the men's quota attainments for FY2015. Thus, there is no evidence that the male comparators failed to meet quota attainments for three straight years. Nor does the chart speak to any of the men's pipeline development. Notably, Ms. Russell's replacement was female – a member of the same protected group – so her replacement is not a comparable.

2. Pretext

In any event, based on the record before the Court, Kronos has offered evidence to support its claim that it had nondiscriminatory reasons for terminating Ms. Russell – *i.e.*, her performance was a problem for the last three years (out of four total) that she worked for Kronos (FY2015, FY2016, and FY2017). Notably, Ms. Russell had three different direct supervisors during her time at Kronos (Mr. Solomon, Mr. Lombardi, and Mr. Lipscomb), and each of them identified problems with performance, both in terms of quota attainment and pipeline development.

Ms. Russell maintains that the asserted reason for termination was actually a pretext for a discriminatory motive, but Ms. Russell has failed to raise a triable issue of fact on pretext. Although the burden on Ms. Russell to raise a triable issue of fact is not onerous, she still is required to provide "specific" and "substantial" facts showing a genuine issue for trial. *Noyes*, 488 F.3d at 1170. None of Ms. Russell's arguments on pretext is convincing.

For example, Ms. Russell argues that she did not, in fact, have three years in a row of low quota attainment because her quota attainment for FY2016 was actually 95%. Ms. Russell admits that her quota attainment of 95% includes one split commission, *see* Hudson Decl., Ex. 190 (Russell Depo. at 165) (upon being asked whether "most of the work [on the U.K. Celesio account] was done by the U.K. team," stating: "I would have to stay it was a fair balance[;] [m]aybe they did a little bit more because they were actually on the ground and we were virtual"), but asserts that she should not be penalized for a split commission, particularly because "there is no written requirement that a sales executive must complete the deals alone to be successful." Opp'n at 2. The problem for Ms. Russell is that, even so, the fact remains that this was the only year where she came close to meeting the quota requirement. The split commission explains why that 95% year was not indicative of a solid performance in the context of her inferior performance in other years. *See* Cullen Decl. ¶ 8 (testifying that the quota attainment "number[] may not reflect

9

the ability of a sales executive to achieve sales individually"); Lipscomb Decl. ¶ 28 (same). Kronos was evaluating Ms. Lipscomb's performance over a period of several years. For FY2015, her quota attainment was about 66% and her direct supervisor, Mr. Solomon, gave her an overall rating of "Inconsistent." Through Q3 FY2017 (*i.e.*, when she was terminated), her quota attainment was about 9%, and there is nothing to indicate that things were likely to improve for Q4 FY2017 (even if Ms. Russell was trying her best to get more deals or close more deals). *See* Lipscomb Decl. ¶ 31.

Ms. Russell's attempts to counter Kronos's evidence are unavailing. To the extent Ms. Russell argues that her ability to achieve her quota for FY2017 was impacted by the transfer of three of her accounts to Mr. Chacko in October 2016; at her deposition, she admitted that the transfer of the accounts was not motivated by a discriminatory animus. Nor does her argument explain her Q3 FY2017 attainment of only 9% of quota. Also, although Ms. Russell claims that Mr. Chacko deliberately delayed in closing the McKesson deals to deprive her of split commissions (which would have given her a higher quota attainment for FY2017), that seems highly implausible given that that would put Mr. Chacko's own commission at risk. But even if he had done so, that would suggest at most that he was acting out of greed, not a discriminatory motive; furthermore, even if he had a discriminatory motive, there is no evidence in the record that Mr. Chacko had any role in the decision to terminate Ms. Russell. To the extent Ms. Russell contends that unrealistic goals were being set for her, it is not entirely clear what she means by this. If, for instance, she is suggesting that it was unrealistic for Kronos to set a 75% quota attainment by the end of the PIP review period (mid-July 2017), *see* Lipscomb Decl., Ex. 20 (PIP), she presents no evidence why that was an unrealistic goal. Finally, even though Ms. Russell argues that Kronos should have given her to the end of FY2017 to try to meet her annual quota, there is no evidence that Kronos had a policy or practice of affording its sales executives such an opportunity – *i.e.*, waiting until the end of a fiscal year to terminate an employee whose performance was substandard. The speculative existence of such a policy or practice would be highly doubtful as it would mean that Kronos could never fire any sales executive until the end of a fiscal year.

Ms. Russell also overlooks the fact that quota attainment was not Kronos's only measure for her performance. Kronos also took into account that Ms. Russell had "almost four years to build her pipeline," "was assigned to a mature vertical," and "had not demonstrated progress in moving opportunities in her pipeline through the various sale stages." Lipscomb Decl. ¶ 31. At the hearing, Ms. Russell protested that sales cycles take several months so a pipeline cannot be developed overnight. But even accepting this as true (the Court notes that Ms. Russell cited to no evidence about sales cycles and their lengths in her papers), the fact remains that Kronos was evaluating her pipeline development over the course of four years. Her three direct supervisors all found her pipeline development a problem. She presents no evidence countering Kronos's record evidence.

Ms. Russell protests still that the asserted reason for her termination was pretextual because Mr. Lipscomb (the main decisionmaker behind her termination) told her within two days of becoming her supervisor that she was not cut out for the job. But even if this is true (Ms. Russell did not claim this as a basis for pretext in her papers nor cite to any evidence in support), the evidence of record reflects that concerns about Ms. Russell's performance started well before Mr. Lipscomb became her supervisor. As indicated above, Mr. Solomon, her first direct supervisor, drafted a LOC in October 2016. Ms. Russell does not contend that Mr. Lipscomb was unaware of her performance problems when he was her direct supervisor.

For the foregoing reasons, the Court concludes that Ms. Russell has failed to raise a triable issue of fact regarding pretext. At best, Ms. Russell has "created only a weak issue of fact as to whether [Kronos's reason for her termination] was untrue," and there is significant "evidence that no discrimination . . . occurred," *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000). That evidence includes not only the evidence discussed above but also the fact that Ms. Russell's replacement was a woman and there is no indication that Kronos had a pattern or practice of disciplining or firing women.

Left with this predicament, Ms. Russell asserts that "disparaging comments about women" were made by:

- Mr. Chacko (who stated, with respect to Serena Williams, that "he was not aware . .

- . a man could have a baby");
- Mr. Solomon (who "commented on the size of a woman's breasts" about four times and "also said that women weren't too bright"); and
- Mr. Lipscomb (who "introduced Ms. Russell [during a meeting in March 2017] [as having] ten kids" even though she does not have any children).

Opp'n at 5. But Mr. Chacko was a co-worker, not a supervisor, and there is no evidence he had any influence on the relevant decisionmakers who approved her termination. Mr. Solomon was not a part of the actual decision to terminate Ms. Russell (having resigned almost a year earlier). And at best Mr. Lipscomb's statement is the kind of "'stray' remark[] . . . insufficient to establish discrimination." *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438-39 (9th Cir. 1990) (indicating that "stray 'remarks, . . . when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are made by the decisionmaker in issue'"); *see also Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir.1993) (concluding that a superior's comment that "[w]e don't necessarily like grey hair" "was uttered in an ambivalent manner and was not tied directly to [the plaintiff's] termination" and thus was "at best weak circumstantial evidence of discriminatory animus").

The Court thus grants Kronos's motion for summary judgment on the sex discrimination claims.

C. <u>National Origin and Race Discrimination</u>

The analysis of Ms. Russell's claims of national origin and race discrimination is similar to the analysis above on Ms. Russell's claims of sex discrimination. That is, there are serious questions as to whether Ms. Russell can even establish a prima facie case of national origin/race discrimination given that her chart at Exhibit 203 does not provide enough information to suggest that the Caucasian individuals listed on the chart were similarly situated in all material respects. *See* Russell Decl., Ex. 203 (not indicating information about forecasts for Q4 FY2017, quota attainments for FY2015, and pipeline development).[8] But even assuming a prima facie case,

---

[8] Ms. Russell identifies two Caucasian individuals who worked at Kronos for a similar period of time as she did (Nicole Sexe, 4 years, and Jennifer Trusty, 3 years). But information about

12

Kronos has offered nondiscriminatory reasons for terminating Ms. Russell – *i.e.*, her performance was problematic – and, for the reasons discussed above, Ms. Russell has failed to raise a triable issue of fact on pretext/discriminatory intent.

D. <u>Retaliation</u>

In addition to Title VII and FEHA disparate treatment, Ms. Russell also brings Title VII and FEHA retaliation claims. That is, Ms. Russell claims that Kronos retaliated against her after she made complaints about sex, national origin, and/or race discrimination. *See, e.g.*, *Nilsson v. City of Mesa*, 503 F.3d 947, 953 (9th Cir. 2007) (noting that "Title VII prohibits, among other things, retaliation against an employee for making a charge or otherwise participating in a Title VII proceeding").

To establish a prima facie case of retaliation under Title VII, a plaintiff

> "must demonstrate that (1) she had engaged in a protected activity;" (2) the [defendant] subjected her "to an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action." "If [the plaintiff] provides sufficient evidence to show a prima facie case of retaliation, the burden then shifts to the [defendant] to articulate a legitimate, non-retaliatory reason for its actions." "If the [defendant] sets forth such a reason, [the plaintiff] bears the ultimate burden of submitting evidence indicating that the [defendant's] proffered reason is merely a pretext for a retaliatory motive."

*Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007). The same legal analysis applies to FEHA retaliation claims. *See, e.g.*, *Flait v. N. Am. Watch Corp.*, 3 Cal. App. 4th 467, 476 (1992).

Ms. Russell's retaliation claims are problematic for reasons similar to those articulated above with respect to her disparate treatment claims – *i.e.*, Kronos has articulated legitimate, nonretaliatory reasons for terminating her and Ms. Kronos's evidence of pretext is weak at best.

Furthermore, Ms. Russell's retaliation claims lack merit for an independent reason. That is, it cannot be said that Kronos terminated Ms. Russell because she engaged in protected activity; the only evidence is that Ms. Russell made complaints about unfair treatment and *not* complaints

---

forecasts for Q4 FY2017, quota attainments for FY2015, and pipeline development is still lacking. *See also Beck*, 506 F.3d at 885 ("[I]n general, we have upheld inferences of discriminatory motive based on comparative data involving a small number of employees when the plaintiff establishes that he or she is 'similarly situated to those employees in all material respects'").

13

about sex, national origin, and/or race discrimination. *See Siazon v. Hertz Corp.*, No. 17-cv-05935-EMC, 2019 U.S. Dist. LEXIS 40857, at *43-44 (N.D. Cal. Mar. 13, 2019) (granting summary judgment to employer on plaintiff's FEHA retaliation claim because plaintiff's "counsel conceded that [plaintiff] never complained to Hertz about age discrimination"); *Mayfield v. Sara Lee Corp.*, No. C 04-1588 CW, 2005 U.S. Dist. LEXIS 42458, at *22-23 (N.D. Cal. Jan. 13, 2005) (stating that, "to constitute protected activity, [plaintiff] must have alerted his employer to his belief that discrimination, not merely unfair personnel treatment, had occurred"). Ms. Russell admitted such in her deposition.

> Q. To the extent you believe you were terminated in retaliation for raising issues, the only times you raised those issues were the two conversations we have gone over, one with Patricia Cullen [of Human Resources] and one with Tony Lombardi?
>
> A. Correct.
>
> Q. Okay. And the conversation with Tony Lombardi, did you ever say that you thought you were being discriminated against on the basis of some protected category, such as sex, national origin, or ethnicity?
>
> A. I – no.
>
> Q. Same question as to Patricia Cullen: Did you ever tell Patricia Cullen that you thought you were being discriminated against on the basis of sex, national origin, ethnicity, or some other protected status?
>
> A. No.
>
> Q. And I think you already testified you never told anyone at Kronos that; right?
>
> A. No.
>
> Q. Correct?
>
> A. Correct.

Hudson Decl., Ex. 190 (Russell Depo. at 239-40).

In her opposition, Ms. Russell protests that a plaintiff is not required to explicitly state that she has been discriminated against on a protected basis and that there are no "magic words" a plaintiff must invoke. While this is true, a plaintiff's "'communications to the employer [must] *sufficiently convey* the employee's reasonable concerns that the employer has acted or is acting in

14

an *unlawful discriminatory manner*.'" *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1047 (2005) (emphasis added). According to Ms. Russell, her complaints to Ms. Cullen and Mr. Lombardi conveyed that "she was [being] targeted." Opp'n at 8. But one can be targeted by a superior without there being any discrimination at play. Ms. Russell's attempt to analogize her case to *Aparicio v. Comcast, Inc.*, 274 F. Supp. 3d 1014 (N.D. Cal. 2017), is unavailing. There, the plaintiff complained not only that "he was being 'targeted and being picked on'" but also that "'Management wants to fire *us*.'" *Id.* at 1031 (emphasis added). Thus, the court held that, "drawing all inferences in [the plaintiff's] favor, it is reasonable to assume that by 'us' he meant people like him, which could be Hispanics or people from El Salvador." *Id.* No similar inference can reasonably be drawn under the facts in this case.

E. <u>Failure to Prevent Discrimination or Harassment</u>

Ms. Russell's claim for failure to prevent discrimination or harassment falls under FEHA. *See* Cal. Gov't Code § 12940(k) (providing that it is unlawful "[f]or an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring").

> In order to state a claim under § 12940(k), a plaintiff must show three elements: "1) plaintiff was subjected to discrimination, harassment or retaliation; 2) defendant failed to take all reasonable steps to prevent discrimination, harassment or retaliation; and 3) this failure caused plaintiff to suffer injury, damage, loss or harm." Section 12940(k) applies to "an employer who knew or should have known of discrimination or harassment" and "fail[s] to take prompt remedial action."

*Alejandro v. ST Micro Elecs., Inc.*, 129 F. Supp. 3d 898, 913 (N.D. Cal. 2015).

Ms. Russell's claim for failure to prevent suffers from at least two problems: (1) her underlying discrimination/retaliation claims lack merit for the reasons discussed above, *see Trujillo v. N. County Transit Dist.*, 63 Cal. App. 4th 280, 239 (1998) (concluding that "[e]mployers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented"); and (2) there is no evidence that Kronos knew or should have known that Ms. Russell was allegedly being

15

1 discriminated against on protected grounds.

F. <u>Wrongful Discharge in Violation of Public Policy</u>

Kronos argues that the claim for wrongful discharge in violation of public policy is derivative of Ms. Russell's employment discriminations, and Ms. Russell does not argue to the contrary. Thus, this claim falls with the other claims discussed above.

### III. CONCLUSION

For the foregoing reasons, the Court grants Kronos's motion for summary judgment.

With this ruling, it appears that the only claims remaining in the case are Kronos's counterclaims (*i.e.*, for violation of California Penal Code §§ 632 and 632.7 or, alternatively, Massachusetts General Law, Chapter 272, § 99). *See* Docket No. 45 (counterclaims). Within a week of the date of this order, Kronos shall file a statement as to whether it intends to proceed with a trial on the counterclaims. If not, the Court shall direct the Clerk of the Court to enter a final judgment in accordance with this opinion. If so, then the parties shall prepare for a trial, although the Court will likely adjust the parameters for trial given the limited claims remaining.

This order disposes of Docket No. 55.

**IT IS SO ORDERED**.

Dated: December 11, 2019

_____
EDWARD M. CHEN
United States District Judge